## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **MOUATASEM ZIENNI,** | ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **7:23-cv-01002-LSC** |
| **MERCEDES BENZ U.S.** | ) ) | |
| **INTERNATIONAL, INC.,** | ) ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF OPINION

Plaintiff Mouatasem Zienni brings this action against Mercedes Benz U.S. International, Inc. ("MBUSI"), asserting claims of religious discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(j), and retaliatory mistreatment claims under 42 U.S.C. §§ 1981, 2000e–3(a). Before the Court is Defendant MBUSI's Motion for Summary Judgment on all claims. (Doc. 20.) For the reasons stated below, Defendant's motion is due to be **GRANTED**.

## I.    BACKGROUND[1]

---

[1]    The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011)

Zienni, "a Lebanese-born Arab" and practicing Muslim, worked on the day shift at MBUSI's vehicle production plant in Vance, Alabama, from June 20, 2022, until early January 2023. (Doc. 1 ¶¶ 3, 11, 38.) Zienni's employment duties included working on a moving assembly line. (Doc. 22-1 at 58:19–59:9.) The assembly line has multiple stations, with a team member posted at each one. (Doc. 22-1 at 60:20 – 61:17.) Team members are assigned certain processes to complete before a vehicle moves to the next station. (*Id.* at 61:6–17.) The assembly line employs a pull cord system which allows team members to pull a cord to alert a team leader if they have an issue at their station or need to take an extra break. (*Id.* at 62:17–63:3; doc. 22-6 at 25:1-17.)

The regularly scheduled breaks in Zienni's department included two paid ten-minute breaks, one paid 15-minute break, and one 35-minute unpaid lunch period per shift. (Doc. 21 ¶ 5.) Zienni was normally scheduled to work four ten-hour shifts—beginning at 6:15 AM and ending at 4:45 PM—per week. (*Id.* ¶ 3.) Occasionally, Zienni's shift would work overtime, but the shift ended "usually no later than 5:20 PM." (*Id.* ¶ 4.)

As a Muslim, Zienni holds the religious belief that he must pray five times a day. (Doc. 1 ¶ 12.) The times at which prayers are to occur vary in accordance with

("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record….").

the position of the sun. (*Id.* ¶ 13.) Zienni uses a smartphone app that alerts him when it is time for him to pray. (Doc. 22-1 at 32:14–19.) Throughout Zienni's employment at MBUSI, two or three prayer times occurred between 6:15 AM and 4:45 PM each day, depending on the time of year. (*See* Doc. 21 ¶ 36; doc. 22-7.) When Zienni started working at MBUSI, he was able to pray at the scheduled times that occurred during his shift by arranging with co-workers to cover his place on the line while he was gone. (Doc. 22-1 at 73:6-75:1.) Zienni pulled the cord when it was time to pray, and either his team leader Tristan Stonski or a fellow team member covered his station until he returned from praying. (*Id.*) Zienni has testified that typically 10 to 15 minutes elapsed from the time he left the line to the time he returned after prayer. (*Id.* at 152:16-153:6.)

In the fall of 2022, Zienni's Group Leader, Rolanda Davis, found Zienni engaged in prayer during a shift. (Doc. 21 ¶ 49; doc. 22-1 at 84:21-85:18.) Davis informed Zienni that he could not pray while the production line was running.[2] (Doc. 21 ¶ 49; doc. 22-4 at 51:1-10.) Zienni continued to pray during his shifts, outside of break times. (Doc. 21 ¶ 51, 53.) The second time Davis found Zienni praying during

---

[2] In his deposition, Zienni testified that the first time Davis found him praying, she did not tell him he could not pray outside break times. (*See* doc. 22-1 at 85:15-86:11.) However, in Paragraph 49 of its Statement of Facts, MBUSI indicates that during that first encounter, Davis did inform Zienni that he could not pray while the production line was running. (Doc. 21 ¶ 49.) Zienni did not dispute the facts alleged in Paragraph 49 in his response to MBUSI's Motion for Summary Judgment. (*See* Doc. 27 at 3.) Regardless, whether Davis told Zienni not to pray outside breaks the first time she found him praying or during one of her subsequent encounters with Zienni is not material to the Court's decision today.

production time, she was with her manager, Edith Palmer. (Id. ¶ 51.) Palmer spoke to MBUSI's human resources department, after which she and Davis met with Mr. Zienni to remind him he could pray during his breaks, but not during production time. (Doc. 21 ¶ 53; doc. 22-2 ¶ 34.) However, MBUSI never formally disciplined or threatened to discipline Zienni for praying during production time. (Doc. 21 ¶ 66, doc. 22-1 at 117:11–118:22.)

During their meeting with Mr. Zienni, Davis and Palmer presented the option of Zienni transferring to the night shift to be able to pray on time. (Doc. 21 ¶ 57; doc. 22-4 at 97:5-17; doc. 22-2 ¶ 35.) Zienni declined, stating that he would still have to pray during the night shift (doc. 22-1 at 127:13-20), which runs from 6:15 PM to 5:20 AM. (Doc. 22-4 at 97:9-11.)

At some point after his conversations with Davis and Palmer, Zienni spoke to Emerson Gore in the human resources department, who told Zienni he could pray during his scheduled breaks and lunch period. (Doc. 22-1 at 76:13-78:11, Ex. 10.) On October 17, 2022, sometime after his meeting with Gore, Zienni filed an EEOC Charge of Discrimination against MBUSI, alleging that MBUSI was engaging in religious discrimination by "failing to accommodate [his] prayer times." (*Id.* at Ex. 10.) Zienni's EEOC Charge also alleged that MBUSI's "discriminatory treatment" was motivated by his race and national origin. (*Id.*)

On November 15, 2022, Zienni asked Davis if there were "any other areas in the plant that he can work that would accommodate his prayer times." (Doc 21 ¶ 55; doc. 22-4 at 80:2-19, Ex. 2.) Davis told him that she did not know, and would have to ask Human Resources. (Doc. 22-4 at 80:2-19, Ex. 2.) At some point during Zienni's employment with MBUSI, Palmer encouraged Zienni to use MBUSI's online job application portal to apply for a transfer to a different position in the plant that may better fit his prayer schedule. (Doc. 21 ¶ 58; doc. 22-2 ¶ 36-37.) Zienni never applied for a transfer or promotion during his employment at MBUSI. (Doc. 22-1 at 28:15-29:3.) On December 5, 2022, Davis and Palmer again found Zienni praying in the Team Center during production time and reminded him of their previous conversations. (Doc. 21 ¶ 62; doc. 22-1 at 104:8-23.) Zienni states that he never missed a prayer time while working at MBUSI. (Doc. 22-1 at 84:18-20.)

At the time Zienni was employed by MBUSI, Ralph Prude was a Star Team Leader ("Star TL") at MBUSI. (Doc. 21 ¶ 28.) "[A] Star TL may fill in for the Group Leader . . . when she is off work, [but a Star TL] has no supervisory authority." (*Id.*) Zienni contends that one day in the fall of 2022, Prude was filling in for Davis as acting Group Leader. (Doc. 1 ¶ 30-31.) Zienni alleges that he asked Prude if he could leave work early that day, and Prude said that everyone could leave early if Zienni shouted "Allahu Akbar." (Doc. 21 ¶ 73; doc 22-1 at 119-20, 145-56.) Zienni also alleges that while Prude was filling in for Davis as Group Leader in December 2022,

Prude told Zienni that "if you don't stop," MBUSI would transfer Zienni to a less desirable position within the plant. (Doc. 21 ¶ 79; doc. 22-1 at 140-42.) Zienni states he took this remark as a reference to his EEOC charge and investigation. (Doc. 22-1 at 142:2-14.) Prude denies making either of the alleged statements. (Doc. 22-6 at 42:3-44:2; 44:10-45:20.)

Zienni decided to seek other employment after MBUSI's winter shutdown. (Doc. 22-1 at 132:23-133:14.) He turned in his two-week notice to MBUSI in January 2023, and his resignation became effective on January 24, 2024. (Doc. 21 ¶¶ 70, 71; doc. 1 ¶ 38.)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In considering a motion for summary judgment, trial courts must give

deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213-14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs.*, LLC, 719 F.3d 1236, 1242 (11th Cir. 2013). If the movant carries its burden in either of the two ways, the burden shifts to the non-movant "to show the existence of a genuine issue [of] material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987).

When a nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986). "In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

### III.    ANALYSIS

### A. COUNT I – TITLE VII RELIGIOUS DISCRIMINATION

In Count I of his complaint, Zienni raises a Title VII religious discrimination claim against MBUSI. Specifically, Zienni argues that MBUSI engaged in discrimination on the basis of religion by failing to accommodate his religious practice of praying at five predetermined times each day. (*See* doc. 1 ¶¶ 45-46.)

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "To establish a reasonable-accommodation claim of religious [discrimination]" under Title VII, "a plaintiff must first set forth a prima facie case by showing that (1) his sincere and bona fide religious belief conflicted with an employment requirement, and (2) his employer took adverse employment action against him because of his inability to comply with the employment requirement or because of the employer's perceived need for his reasonable accommodation." *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1275 (11th Cir. 2021) (citing *EEOC. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015)). If a plaintiff successfully "makes out a prima facie case, the burden shifts to the employer to show that it either" (1) offered the plaintiff a "reasonable accommodation" or (2) could not do so without "undue

hardship on its business." *Bailey*, 992 F.3d at 1275 (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986)).

As an initial matter, MBUSI does not dispute that Zienni's belief that he must pray five times a day is a "sincere and bona fide religious belief." Rather, MBUSI contends that Zienni cannot make out a prima facie case of religious discrimination because there is no conflict between Zienni's bona fide religious belief and MBUSI's employment practices. (Doc. 21 at 18.) "The reasonable-accommodation principle is implicated only when there is a conflict between an employee's religious practice and the employer's neutral policy; only then does a need to accommodate arise." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1120 (10th Cir. 2013), *rev'd and remanded on other grounds*, 575 U.S. 768 (2015) (citing EEOC Compliance Manual § 12–IV(A)(1)). "For there actually to be a conflict, logic dictates that an applicant or employee must consider the religious practice to be an inflexible one—that is, a practice that is required by his or her religious belief system." *Abercrombie*, 731 F.3d at 1120, *rev'd and remanded on other grounds*, 575 U.S. 768. MBUSI argues that based on Zienni's own testimony, there is no actual conflict between Zienni's sincere and bona fide religious belief regarding prayer and MBUSI's employment practice regarding shift breaks.

For example, in Zienni's deposition, he testified that if a person were to miss one of the five daily prayer times, making up that prayer before the next prayer time

occurs "rights up some of your mistakes." (Doc. 22-1 at 53:5–6.) MBUSI states that if Zienni had to miss a Second or Third Prayer that fell outside his break time, he "always had a break during which he could pray" between the missed prayer and the next scheduled prayer time.[3] (*See* Doc. 21 ¶ 42 (citing doc. 22-7; *Prayer Times in Tuscaloosa, AL*, ISLAMIC FINDER, https://www.islamicfinder.org/world/united-states/4094455/tuscaloosa-prayer-times/ (last visited May 14, 2024)).) Thus, MBUSI argues there was no conflict between Zienni's religious practice and MBUSI's employment practices, as Zienni could have made up missed prayers during his regularly scheduled breaks without the need for any accommodation. (Doc. 21 at 16–18.)

Additionally, MBUSI notes that during Zienni's deposition, the deposing attorney asked a hypothetical question about a doctor who was in surgery during a prayer time. (*See* Doc. 22-1 at 53:13-54:5.) Zienni agreed with the attorney that the hypothetical doctor could make up the prayer he missed during surgery by praying before the next prayer time came. (*See id.*)

MBUSI asserts that "when a plaintiff contends he must conduct a religious practice at a certain time," if the plaintiff does not establish that "both the practice

---

[3] The "Prayer & Shift Times" chart submitted by MBUSI indicates that Fourth Prayer may have occasionally occurred before Zienni's shift ended, depending on whether he worked overtime on a given day. (See doc. 22-7.) But even if Zienni's shift did not end until 5:20 pm—the latest a shift usually worked overtime—he would have had a chance to "make up" any missed Fourth Prayer before it was time for the Fifth Prayer. (See id.; doc. 21 ¶ 4.)

and the temporal mandate are part of his bona fide religious belief," then "the timing of the religious practice is a personal preference." (Doc. 21 at 20 (citing *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 682 (9th Cir. 1998)).) Because Zienni testified that a person could "right[] up some of [their] mistakes" by making up missed prayers, MBUSI argues that Zienni's desire to pray at the predetermined times was not mandated by his religious belief. MBUSI reasons that if making up prayers during his scheduled breaks or lunch periods was permissible under Zienni's religion, then MBUSI's employment practice—requiring him to pray on his breaks or lunch period—was not in conflict with Zienni's religious belief. (Doc. 21 at 20.) Instead, MBUSI argues that its employment practice was simply in conflict with Zienni's personal preference to pray at the predetermined times, which "Title VII does not require an employer to accommodate." *See id*. at 19 (citing *EEOC v. Papin Enters., Inc.*, 2009 WL 2256023, at *4 n.11 (M.D. Fla. July 28, 2009)).

It is true that "Title VII only obliges employers to provide a reasonable accommodation for practices that . . . employees engage in because of bona fide, sincerely held religious beliefs." *Chandler v. Infinity Ins. Grp.*, 2014 WL 2547826, at *8 (N.D. Ala. June 4, 2014) (citing *Questions and Answers: Religious Discrimination in the Workplace*, EQUAL EMP. OPPORTUNITY COMM'N (July 22, 2008), https://www.eeoc.gov/laws/guidance/questions-and-answers-religious-discrimination-workplace); *see also* 2 EEOC Compl. Man. § 12 (Jan. 15, 2021)

("[M]ere personal preferences[] are not religious beliefs protected by Title VII."). However, when a plaintiff has presented evidence that they hold a sincere religious belief rather than a mere personal preference, "[d]etermining their credibility on th[at] point is a matter for the jury, not the court." *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 855 (11th Cir. 2010) (reversing district court's grant of summary judgment due to conflicting evidence as to whether Christian employees' refusal to remove artwork depicting a Bible verse from their office was part of their sincere religious belief).

In the instant case, Zienni has presented evidence that he has a sincere religious belief that not only must he pray, but he must pray at the predetermined times. For example, although Zienni agreed that making up a missed prayer would "fix up … [the] mistake of being late," he also testified that missing a prayer is "frowned upon." (Doc. 22-1 at 51:23.) Moreover, Zienni stated that making up prayers would "right[] up *some* of your mistakes," (*id*. at 53:5-6 (emphasis added)), implying that only some of the error caused by missing a prayer would be remedied by making it up, even if it was "better late than never." (*Id.* at 53:11–12.) A reasonable jury considering the record as a whole could determine that Zienni's asserted need to pray at specific times is part of his sincerely held religious belief, and is not just a personal preference. The record clearly indicates that MBUSI's employment requirements—namely, that Zienni not leave his station while the line

was running—conflicted with that belief. Thus, a reasonable jury could conclude that Zienni does have a sincere religious belief that conflicted with MBUSI's employment practices.

Nevertheless, even if Zienni has a sincere religious belief that conflicted with MBUSI's employment requirements, he cannot establish the second element of his prima facie case because MBUSI did not take any adverse employment action against him. Title VII's "disparate treatment provision prohibits any employment practice that 'discriminate[s] . . . with respect to . . . compensation, terms, conditions, or privileges of employment,' including those that fall short of discharge or discipline." *Staple v. School Board of Broward County, Florida*, 2024 WL 3263357, at *4 (11th Cir. July 2, 2024); *see also* 42 U.S.C. § 2000e-2(a)(1). The Eleventh Circuit has held that "there is no heightened discharge or discipline requirement for religious accommodation claims under the disparate treatment provision" of Title VII. *See Staple*, 2024 WL 3263357, at *4 (citing *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1275 & n.4 (11th Cir. 2021)). An action alleging religious discrimination based on the failure-to-accommodate theory is thus subject to the same "adverse employment action" requirement as any other disparate treatment claim. *See Staple*, 2024 WL 3263357, at *3-4.

The Supreme Court recently clarified the breadth of the adverse employment action element of a Title VII disparate treatment claim. *See Muldrow v. City of St.*

*Louis*, 144 S. Ct. 967 (2024). In *Muldrow*, the Court held that a plaintiff need only demonstrate "*some* harm"—not a "significant" harm—"respecting an identifiable term or condition of employment" to establish the adverse employment action element of their disparate treatment claim. *Id.* at 974 (emphasis added). Applying this standard, the Court held that a plaintiff's transfer from a "plainclothes job in a prestigious specialized division . . . to a uniformed job supervising one district's patrol officers" could qualify as an adverse employment action, even though the plaintiff's "rank and pay remained the same." *Id.* at 977. The Court reasoned that disadvantageous changes to the non-economic or intangible terms and conditions of employment—such as loss of responsibilities or transfer to a "less regular" schedule—are still adverse employment actions so long as they leave the plaintiff "worse off." *Id.* at 977.

Unlike the plaintiff in *Muldrow,* Zienni has not demonstrated *any* harm to the terms or conditions of his employment at the hands of MBUSI; thus, he cannot clear even the recently lowered bar to establish an adverse employment action. It is unclear what exactly Zienni claims to be the adverse employment action taken against him in this case. Zienni argues he "was left 'worse off' by MBUSI's denial of an accommodation than if they had granted it," seemingly asserting that MBUSI's instruction that Zienni could not leave the running assembly line to pray was itself an adverse employment action. (Doc. 27 at 15.) This argument fails for several

reasons. First, it conflates the two steps in the analytical framework of a failure-to-accommodate claim. Step One requires the plaintiff to make a prima facie case of discrimination, which includes establishing that "his employer took adverse employment action against him." *See Bailey,* 992 F.3d at 1275. Only once a plaintiff successfully establishes their prima facie case does the Court move on to Step Two and consider whether the defendant employer offered the plaintiff a reasonable accommodation. *See id.*

Additionally, even if an alleged failure to accommodate could itself serve as evidence of an adverse employment action, here the alleged failure to accommodate did not result in any change to Zienni's employment. Zienni alleges that MBUSI failed to accommodate his religious beliefs when Davis, Palmer, and Human Resources told him he could not leave the assembly line to pray outside regularly scheduled breaks. First, nothing in the record suggests that the ability to leave the line to pray was ever a "term" of his employment; rather, the evidence indicates that Zienni's system of signaling someone to cover his station at prayer time was simply an arrangement with his coworkers, not an accommodation granted by MBUSI.[4] Thus, MBUSI's instruction that Zienni confine his prayers to his scheduled break

---

[4] Zienni testified that he did not tell any of his group leaders that he needed prayer breaks when he started working at MBUSI (doc. 22-1 at 73:6-9), and that the first time the topic "came up" was when Ms. Davis and Ms. Palmer found him praying in the Team Center. (Id. at 75:8-76:9, 86:12-87:8.)

times did not result in a change to any existing term or condition of Zienni's employment.

Second, even after MBUSI's alleged denial of accommodations occurred, none of the record evidence suggests that Zienni suffered a reduction in pay or responsibilities, a schedule modification, or any other change to any term or condition of his employment—let alone a disadvantageous change. In fact, according to Zienni's own testimony, he was never transferred to a different position during his employment at MBUSI.[5] (Doc. 22-1 at 28:15-29:3.) Zienni also testified that during his employment with MBUSI, he never received a corrective performance review or any other form of discipline, nor did he recall being threatened with any future discipline. (Doc 22-1 at 117:11–118:12-22.)

In an attempt to demonstrate an adverse employment action, Zienni points to Ms. Davis' testimony that she *would have* informed HR if she caught him praying outside of breaks again. (Doc. 27 at 15; *see* doc. 22-4 at 116:15-117:2.) Zienni also cites Human Resources Manager David Olive's testimony that if Zienni had continued to violate supervisors' directions, he *could have* been subject to discipline,

---

[5] Zienni was placed on work "restrictions" several different times after reporting work-related pain or injuries to MBUSI's medical department. (*See* doc. 22-1 at 87-98.) Zienni's deposition testimony indicates that being "put on restrictions" did not equate to a transfer to a different position, but rather assignment to certain stations or tasks that would avoid exacerbating the pain or injury Zienni had complained of. (*See, e.g., id.* at 89:21 – 90:10.) Zienni does not allege that his placement on restrictions amounted to a transfer, form of discipline, or other adverse employment action.

which may eventually have included termination. (Doc. 27 at 15; *see* doc. 22-3 at 65:22-67:16.) However, these hypothetical actions did not occur and thus caused no actual harm to an "identifiable term or condition" of Zienni's employment. *Muldrow*, 144 S. Ct. 974. In reality, the only change to Zienni's employment occurred when he made the choice to resign from MBUSI and look for work elsewhere.[6] Because Zienni has failed to establish an adverse employment action taken against him, he cannot make out a prima facie case of religious discrimination as a matter of law. Thus, an analysis of whether MBUSI offered Zienni a reasonable accommodation or if such an accommodation would cause undue hardship is unnecessary.

Zienni has "fail[ed] to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he would] bear the burden of proof

---

[6] Resignation may sometimes satisfy the adverse employment element of a Title VII discrimination claim when it amounts to "constructive discharge." See, e.g., *Davis v. Legal Servs. Alabama, Inc.*, 19 F.4th 1261, 1267 (11th Cir. 2021) (citing *Green v. Brennan*, 578 U.S. 547, 555 (2016)) ("Under Title VII, a constructive discharge is tantamount to an actual discharge, so it constitutes an adverse employment action."). "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Davis*, 19 F.4th at 1267 (citing *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009)). However, Zienni has not alleged constructive discharge, nor has he pointed to any evidence that MBUSI created "intolerable" working conditions that forced Zienni to quit. Furthermore, it appears from his Complaint and his Response in Opposition to MBUSI's Motion for Summary Judgment that the action Zienni contends constitutes an adverse employment action against him was MBUSI's denial of an accommodation, not his resignation from MBUSI. *See* doc. 1 ¶ 45-46 (alleging that MBUSI "revoked an accommodation in the form of a modified work schedule that initially enabled Zienni to . . . engage in prayer at certain prescribed times" and "subjected Zienni to unlawful discrimination based on his religion by denying him the continued use of the aforementioned accommodation"); *see also* doc. 27 at 15 (arguing "Zienni was left 'worse off' by MBUSI's denial of an accommodation than if they had granted it").

at trial": that MBUSI took an adverse employment action against him. *Celotex*, 477 U.S. at 322. Accordingly, MBUSI's Motion for Summary Judgment on Zienni's Title VII religious discrimination claim is due to be granted.

## B. RETALIATORY MISTREATMENT CLAIMS UNDER 42 U.S.C. §§ 1981, 2000E-3(A)

Zienni also asserts retaliatory mistreatment claims under 42 U.S.C. § 1981 and § 2000e–3(a) (Title VII), alleging that "he was threatened with a reassignment to onerous and unfavorable working conditions" because he filed a charge of discrimination with the EEOC. (Doc. 1, ¶¶ 49–59.) § 1981 retaliation claims "are analyzed under the same framework as Title VII claims." *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020). To make a prima facie showing of retaliation under Title VII or § 1981, "a plaintiff must first show (1) that '[they] engaged in statutorily protected activity,' (2) that '[they] suffered an adverse action,' and (3) 'that the adverse action was causally related to the protected activity.'" *Id.* (quoting *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018); *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009)).

As an initial matter, MBUSI argues that Zienni's Title VII retaliation claim fails because Zienni did not sufficiently exhaust his administrative remedies. (Doc. 21 at 28 n.15.) MBUSI also argues that Zienni's § 1981 retaliation claim fails because § 1981 prohibits retaliation due to a complaint of discrimination based on the plaintiff's race, not his religion. (*Id.*) However, the Court declines to decide either

issue today. Even if Zienni administratively exhausted his Title VII retaliation claim and sufficiently established that his retaliation claim is cognizable under § 1981, MBUSI would still be entitled to summary judgment on both retaliation claims. Specifically, because Zienni cannot establish the second or third elements of a prima facie case of retaliation, his retaliation claims necessarily fail as a matter of law.

MBUSI does not dispute that Zienni's filing of an EEOC Charge of Discrimination constitutes a "protected activity." (*See* Doc. 21 at 28 n.16 ("Until Plaintiff filed a Charge of Discrimination with the EEOC, he had not engaged in any opposition to allegedly discriminatory conduct or participated in any such opposition.")) Thus, the Court assumes for the purpose of analysis that Zienni has established the first element of a prima facie case of retaliation. To satisfy the second element, Zienni must demonstrate that he suffered an adverse action.[7] "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67 (2006). There is a "level of seriousness to which this harm must rise before it becomes actionable retaliation." *Id.* Specifically, "a plaintiff must show that a reasonable employee would have found the challenged action materially

---

[7] Notably, because "Title VII's substantive provision and its antiretaliation provision are not coterminous," what is required to establish an "adverse action" in a retaliation claim is not the same as what is required to establish an "adverse employment action" in a substantive discrimination claim under Title VII. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" *Id*. at 67–68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Zienni claims that Prude's alleged comment that Zienni would be transferred to a different position if he "d[idn't] stop" constitutes an adverse action as required to make out a prima facie retaliation case. (Doc. 27 at 28.) Prude denies making this comment. (Doc. 22-6 at 44:10-45:20.) But as MBUSI points out, even if Prude did make the comment, such a statement made by a fellow employee with no supervisory authority at MBUSI does not amount to a "materially adverse" action. *See White*, 548 U.S. at 68 ("We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth 'a general civility code for the American workplace.'" (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998))).

Zienni asserts that "whether [he] understood that Prude had no ability to influence a transfer" is "critical to whether [Prude's] conduct was dissuasive." (Doc. 27 at 29.) However, according to the Supreme Court, the opposite is true. After laying out the test for adverse action in *White*, the Court explained that it "refer[red] to reactions of a reasonable employee because . . . the provision's standard for judging harm must be *objective.*" *White*, 548 U.S. at 68 (emphasis added). The Court reasoned that "[a]n objective standard . . . avoids the uncertainties and unfair

discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68-69. Thus, whether Zienni subjectively believed Prude had the authority to effect a transfer is irrelevant to the determination of whether Prude's alleged statement was an "adverse action" for retaliation purposes. The relevant consideration is whether "a reasonable person in the plaintiff's position" would have been dissuaded from "complaining or assisting in complaints about discrimination." *White*, 548 U.S. at 69-70.

Zienni does not dispute that "[w]hile a Star TL" such as Prude "may fill in for the Group Leader ("GL") when she is off work, he has no supervisory authority." (Doc. 21 ¶ 28; *see* doc. 27 at 3 (not listing ¶ 28 as a "disputed factual contention.")) Zienni has failed to show that a reasonable employee in his position would be deterred from making a charge of discrimination by the "threat[] [of] reassignment to onerous and unfavorable working conditions" (doc. 1 ¶ 52), from a coworker with no power to make good on the alleged threat. Prude's alleged statement fails to meet the objective standard used to determine whether an adverse action has occurred, and Zienni thus fails to establish an essential element of his retaliation claims.

Furthermore, even if Prude's alleged comment satisfied the adverse action requirement, MBUSI would still be entitled to summary judgment on Zienni's retaliation claims, because Zienni cannot establish the causal connection element of his prima facie case. "To establish a causal connection [between a protected activity

and an adverse action], a plaintiff must show that the relevant decisionmaker was 'aware of the protected conduct . . . .'" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013) (quoting *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir.2002)). Even if Prude were a "decisionmaker," the record evidence indicates he was unaware that any EEOC charge had been filed at the time Prude allegedly made the comment about a transfer. At his deposition, Prude testified that during the time of Zienni's employment at MBUSI, Prude never became aware that Zienni had filed a complaint of discrimination against MBUSI. (Doc. 22-6 at 56:5-56:11.) In fact, it appears that at the earliest, Prude did not learn of Zienni's EEOC charge until he was contacted by MBUSI regarding Zienni's lawsuit. (*Id.* at 55:20-56:11.)

The Eleventh Circuit has held that "neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge." *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1156 (11th Cir. 2002). When "the direct evidence shows only that [the decision-maker] was unaware" of a charge of discrimination, the Plaintiff must "present . . . other evidence of [the decisionmaker's] knowledge" or "evidence that impeaches [the decisionmaker's] denial of knowledge" in order to escape summary judgment. *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020).

Zienni argues that he has raised sufficient evidence of Prude's knowledge to create "a triable issue of fact" regarding causal connection. (Doc. 27 at 32). Specifically, Zienni points out that in December 2022, his previous counsel submitted a rebuttal to MBUSI's position statement responding to Zienni's EEOC charge. (Doc. 26-1 at 11-13.) The rebuttal states that "after [Zienni] filed his EEOC Charge, a group leader at [MBUSI] named Ralph came up to [Zienni] and told him that everyone would get to go home early if he said . . . 'Allah O Akbar'" [sic]. (*Id.* at 12.) Zienni alleges that Prude's comment about a transfer to an unfavorable position occurred in December 2022. (*See* doc. 27 at 31, doc. 21 ¶ 79.) Accordingly, Zienni claims that "a jury could readily infer that to investigate Zienni's allegation, MBUSI would have easily traced the story to Prude given the reference to his name and position on Zienni's shift [in the rebuttal], and would have questioned him, in effect revealing the charge." (Doc. 27 at 31.)

However, the Eleventh Circuit has repeatedly held that evidence that a person with knowledge "could have told" or "had an opportunity to tell" the decisionmaker that the plaintiff engaged in a protected activity "is not itself evidence of [the] decisionmaker's knowledge." *See Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020) (discussing the holding in *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346 (11th Cir. 1999)); *see also Moss v. St. Vincent's Health Sys.*, 2024 WL 729953, at *4 (11th Cir. Feb. 22, 2024) ("An argument that the

decisionmaker must have known about the protected activity is too speculative because evidence that she could have known about it is not the same as evidence that she did." (citing *Martin*, 959 F.3d at 1054)). Additionally, in *Martin*, the Eleventh Circuit rejected a circumstantial-evidence-based argument very similar to the one Zienni raises here. *Martin*, 959 F.3d at 1054. The plaintiff in *Martin* complained to her employer's human resources department regarding the CEO's allegedly discriminatory conduct toward her. The plaintiff argued that the Court should infer the CEO's knowledge of her complaint, citing as evidence a company policy requiring the human resources department to disclose complaints of discrimination to the alleged perpetrator. *Id*. at 1055. However, the plaintiff offered no direct evidence that this disclosure actually occurred. *Id*. The Court found that the conclusions it would need to draw to accept the plaintiff's argument were more than "the 'reasonable inferences' to which [the plaintiff] is entitled at summary judgment," *id.*, and affirmed the district court's entry of summary judgment against her, *id*. at 1050.

Like the evidence offered by the plaintiffs in *Martin*, *Clover,* and *Moss*, Zienni's purported evidence that a jury could infer Prude's knowledge of Zienni's EEOC charge is insufficient to rebut Prude's sworn testimony that he had no such knowledge. As Zienni has offered no other evidence of Prude's knowledge nor any

evidence that would impeach Prude's denial of knowledge, Zienni has failed to establish the causal connection element of his retaliation claims.

MBUSI has supported its motion for summary judgment on Zienni's retaliation claims by pointing to "affirmative evidence demonstrating that" Zienni cannot establish the adverse action element of his claims. *See Fitzpatrick*, 2 F.3d at 1116. In the alternative, MBUSI has demonstrated that even if Prude's alleged comment did amount to an adverse action, "there is an absence of evidence" to establish the causal connection element of a prima facie case of retaliation. *See id*. In response, Zienni has failed to meet his burden "to show the existence of a genuine issue as to [any] material fact." *Id.* Accordingly, MBUSI's motion for summary judgment as to Zienni's Title VII and § 1983 retaliation claims is due to be granted.

## IV.  CONCLUSION

For the reasons described above, MBUSI's Motion for Summary Judgment is due to be **GRANTED**. An Order consistent with this Opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on November 19, 2024.

L. Scott Coogler
United States District Judge

215647